# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-509

**STATE OF LOUISIANA**

**VERSUS**

**SEAN BERNARD NEWTON**

\*\*\*\*\*\*\*\*\*\*
## APPEAL FROM THE
## FOURTEENTH JUDICIAL DISTRICT COURT
## PARISH OF CALCASIEU, DOCKET NO. 16048-10
## HONORABLE CLAYTON DAVIS, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

## SYLVIA R. COOKS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy Howard Ezell and J. David Painter, Judges.

**AFFIRMED IN PART AND SEVERED IN PART WITH INSTRUCTIONS.**

John F. DeRosier, District Attorney
Carla S. Sigler, Assistant District Attorney
Karen C. McLellan, Assistant District Attorney
901 Lakeshore Street, Suite 600
Lake Charles, LA  70601
(337) 437-3400
**ATTORNEY FOR APPELLEE**
    State of Louisiana

Theodore G. Hartman
1 Lakeshore Drive, Suite 1460
Lake Charles, LA  70601
(337) 564-6501
**ATTORNEY FOR DEFENDANT/APPELLANT**
    Sean Bernard Newton

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Defendant, Sean Bernard Newton, his brother, Brandon Newton, his cousin, Joshua Lambert, and three friends, Andre Broussard, Jarius Watson, and Marlon Kelly, left the Prien Lake Mall on the evening of March 27, 2010, in Defendant's car and drove to a neighborhood behind the mall called "Brownsville" in anticipation of fighting with another gang of young men. The confrontation began at the mall, but the two groups were sent out of the mall by the security guards. Defendant had in his possession a handgun. Meanwhile, the victim, fourteen-year-old Alexus Rankins, and two of her friends were walking through the "Brownsville" neighborhood on their way home from the theater in the mall. Defendant drove around the neighborhood until he and his companions found the group of men they were arguing with at the mall. When the men approached the car, taunting Defendant, he fired a single shot into the group. The bullet struck the victim in the head. She died two days later as result of the gunshot wound.

Defendant, Sean Bernard Newton, was indicted for one count of first degree murder, a violation of La.R.S. 14:30, one count of obstruction of justice, a violation of La. R.S. 14:130.1, and one count of inciting to riot, a violation of La.R.S. 14:329.2. A jury trial commenced on May 16, 2011. On May 24, 2011, the jury returned a guilty verdict on all charges. A presentence investigation report was ordered, and sentencing was set for July 20, 2011.

On July 19, 2011, Defendant filed a "Motion for a New Trial." The motion was heard on July 20, 2011, and denied. Defendant waived all sentencing delays and was sentenced on the same date to life imprisonment without the benefit of probation, parole, or suspension of sentence on the first degree murder conviction, twenty years at hard labor on the obstruction of justice conviction, and six months in the parish jail on the conviction for inciting a riot. All sentences were ordered to

be served concurrently.  Defendant did not file a motion to reconsider the sentences.

Defendant perfected a timely appeal.  He alleges that his right to due process was violated pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963) on three separate occasions.  He also alleges ineffective assistance of trial counsel.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record.  After reviewing the record, we find there is one error patent and a procedural issue requiring discussion.

There was a misjoinder of offenses in the indictment.  Louisiana Code of Criminal Procedure Article 493 provides for the joinder of offenses in a single indictment under limited circumstances if the offenses joined are triable by the same mode of trial.

In the present case, counts one and three, which are punishable at hard labor, are triable by a twelve-person jury, ten of whom must concur.  La.Code Crim.P. art. 782.  Count two is a misdemeanor triable by a judge only.[1]  La.Code Crim.P. art. 779(B).  Therefore, pursuant to La.Code Crim.P. art. 493, counts one and three were properly joined in the indictment, but count two, the misdemeanor, was not.

However, Defendant did not file a motion to quash the bill of information on the basis of misjoinder of offenses as required by statute.  La.Code Crim.P. art. 495.  Accordingly, review of this error is waived.

There is also a procedural issue present.  Because the misdemeanor charge is not triable by jury, the proper mode of appellate review for that offense is an application for writ of review, rather than an appeal.  La.Code Crim.P. art. 912.1.

---

[1] There is no indication in the bill of information that the State sought to charge the Defendant with felony-grade inciting to riot.  La.R.S. 14:329.7.

3

In *State v. Turner*, 04-1250 (La.App. 3 Cir. 3/2/05), 896 So.2d 286, *writ denied*, 05-871 (La. 12/12/05), 917 So.2d 1084, this court severed a misdemeanor conviction from the defendant's appeal of two felony convictions. This court ordered the defendant to file a writ of review regarding the misdemeanor conviction in compliance with the rules of court. This court noted that the defendant did not make any specific arguments regarding the misdemeanor conviction. Consequently, this court considered the notice of appeal as a notice to file a writ of review within thirty days of its opinion, if the defendant desired to seek review of the misdemeanor conviction.

In this case, the Defendant does not raise any assignment of error regarding the misdemeanor conviction. Therefore, following this Court's holding in *Turner*, we will sever the misdemeanor conviction from the appeal and order Defendant to file a writ of review regarding the misdemeanor conviction in compliance with the Uniform Rules—Courts of Appeal 1-3, if he so desires.

## ANALYSIS

*Assignments of Error Numbers 1-3*

In each of his first three assignments of error, Defendant alleges he suffered violations of his right to due process pursuant to *Brady v. Maryland*, 83 S.Ct. 1194, when the State failed to disclose exculpating evidence prior to trial. He alleges the State failed to disclose inconsistent statements given by two witnesses, Joshua Lambert and Terri Brown, who testified at trial. He further contends the State failed to inform him that Jarius Watson was offered immunity in exchange for his testimony.

In *State v. Harper*, 10-356, pp. 8-12 (La. 11/30/10), 53 So.3d 1263, 1269-71, the supreme court discussed the *Brady* principle, as follows:

> In accordance with the due process clause of the Fourteenth Amendment to the United States Constitution, the State must disclose evidence which is favorable to the defense when "the evidence is

material either to guilt or to punishment" or impeaches the testimony of a witness where "the 'reliability [or credibility] of a given witness may well be determinative of guilt or innocence.'" *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97; *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985*); see also, State v. Rosiere,* 488 So.2d 965, 970 (La.1986). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; see also *Rosiere*, 488 So.2d at 970-71. Contrarily, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). "Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3380. Significantly, because the prosecution "alone can know what is undisclosed," it is "assigned the consequent responsibility to gauge the likely net effect of all such [favorable] evidence [unknown to the defense] and make disclosure when the point of 'reasonable probability' is reached." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).

. . . .

Nevertheless, the State's constitutional obligation to disclose exculpatory evidence does not relieve the defense of its obligation to conduct its own investigation and prepare a defense for trial as the State is not obligated under *Brady* or its progeny to furnish defendant with information he already has or can obtain with reasonable diligence. *State v. Kenner*, 05-1052, p. 2 (La.12/16/05), 917 So.2d 1081, 1081 (citing *United States v. Newman,* 849 F.2d 156, 161 (5th Cir.1988)); *see also, Michigan v. Harvey*, 494 U.S. 344, 348, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990) ("The essence of [defendant's] right [to assistance of counsel for his defense] . . . is the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial."). It follows, therefore, " '[t]here is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose.' " *State v. Hobley*, 98-2460, p. 25 n. 10 (La.12/15/99), 752 So.2d 771, 786 (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998)), *cert. denied*, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000). As the United States Fifth Circuit Court of Appeal has noted:

> Regardless of whether the request was specific or general, and regardless of whether the evidence was

material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.

The constitutional requirement of due process mandates that the defendant have a right to a fair trial. The prosecutor's duty not to suppress material information favorable to defendant flows from his office as representative of the Government's interest in and due process obligation to justice. Truth, justice, and the American way do not, however, require the Government to discover and develop the defendant's entire defense. . . . In no way can information known and available to the defendant be said to have been suppressed by the Government.

*United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980) (citations omitted). Moreover, the State has, "of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor," and there is no corresponding "constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Agurs*, 427 U.S. at 106-09, 96 S.Ct. at 2399-2400; *see also Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).

*Joshua Lambert*

Joshua Lambert testified at trial he was the front seat passenger in Defendant's car when Defendant fired a shot out the driver's side window into the group of men approaching the car. He testified, after the shooting, they drove to Lambert's house, where the gun was hidden in a carport and Defendant burned his tee shirt. During this time, one of the boys received a text telling them a little girl had been shot. Defendant, Brandon Newton, and Lambert then went to Defendant's apartment where they told Defendant's parents he had shot a little girl. In an effort to cover for the boys, Defendant's mother, Nina Newton, immediately called the police and reported that the boys had been assaulted at the mall by a gang of men.

Officer Mark Chatman was dispatched to Defendant's apartment. Defendant's mother, who did most of the talking, told the officer the boys had

heard a shot as they left the mall after a confrontation with a gang of men. After Defendant asked the officer how the little girl was, the officer asked Defendant, his parents, brother, and Lambert to go to the police station. Officer Chatman did not speak with them again after this initial meeting.

Defendant argues in brief that "[t]he fact that Joshua Lambert exculpated Sean Newton in a police interview with Officer Chatham [sic] is clearly a <u>Brady</u> violation. Chatham [sic] was an important police officer in this case who was told by the state's main witness Joshua Lambert that Sean Newton did not do this crime."

Defendant refers to the following cross-examination of Officer Chatman regarding Lambert's alleged inconsistent and exculpatory statements:

Q. Okay. And when you went there, you spoke to Nina and Rodney Newton?

A. That's correct. I mainly spoke with Ms. Newton.

Q. Ms. Newton, right?

A. Yes.

Q. But you also spoke to Sean and Josh Lambert, correct, Sean Newton and Joshua Lambert?

A. No. Most of my conversation was with Nina Newton.

Q. Officer, I'm not asking about "most of your conversation." My question is very clear. Didn't --

A. Uh-huh (yes).

Q. –you speak to Joshua Lambert at his aunt and uncle's apartment on the night of March 27th of 2010?

A. Yes.

Q. Okay. And he told you that he was in some type of altercation with another group of guys near the mall, correct?

A. That's correct.

Q. He never told you that Sean Newton shot any gun that night, did he?

7

A. That's correct.

Q. He never—and you spoke with him, right?

A. That's correct.

Q. You (sic) never told you after the shooting he went by his apartment and Sean burned a shirt, did he?

A. No.

Q. Okay.

A. Uh-huh (yes).

Q. And he never told you that after the shooting, he went to his apartment and got rid of the gun, did he?

A. No.

Defendant contends the inconsistent and exculpatory evidence was that Lambert never told the officer that Defendant shot the victim, burned his shirt, or hid the gun. We note it is difficult to classify statements never made as non-disclosed inconsistent and exculpatory evidence. Lambert never made such statements because, as he explained at trial, Defendant's mother concocted a story to tell the police in an attempt to cover up the boys' participation in the shooting of the victim, and everyone, including Lambert, went along with the story. Defendant's argument that the State either intentionally or negligently failed to disclose what the witness did not say to Officer Chatman is absurd, particularly as everyone, Defendant, his mother, father, and brother, all co-defendants, were present when the alleged inconsistent and exculpatory statements were not made.

*Jarius Watson*

Defendant also contends the State failed to reveal that Jarius Watson, who was with Defendant the night of the shooting, was offered immunity for his testimony. Watson testified he was in the back seat of Defendant's car and heard a gunshot. Watson testified he had seen the gun on the console between the driver's

8

seat and the passenger's seat, and it sounded like the driver of the car—whom, he testified, was Defendant—had shot the gun out the window. Watson was charged with obstruction of justice and inciting a riot as a result of his participation in the incident.

Defendant asserts that Watson "clearly believed that he would receive immunity in exchange for his testimony." Defendant asserts had he known about this inducement, "defense investigators could have investigated Watson's incentive to testify on behalf of the State, specifically the strength of the State's case for obstruction of justice against Watson and the nature of the inducement."

At trial, during cross-examination, Watson stated:

Q. Okay. Now, have you spoken with your attorney about any type of deal in this case?

A. No, sir.

Q. Okay. Do you expect any kind of benefit for your testimony?

A. Yes, sir.

Q. What do you expect?

A. Immunity.

Q. Okay. So you got immunity?

. . . .

Q. Okay. When did you get that?

A. I'm not sure if I have it yet, but they was [sic] talking about it.

Q. Who was talking about it?

A. My lawyer and I.

. . . .

Q. And she told you that it's okay to testify, because you have immunity, that it won't be used against you?

A. No, sir.

Q. And she told you she got that from the DA's office?

9

A. No, sir. She just said she was talking to Ms. Jennifer about it. She didn't tell me if it's exact or nothing like that.

Q. Who is Ms. Jennifer—Bellon?

A. I guess. The DA?

Q. She works at the DA's office?

A. Yes, sir.

Q. So your lawyer talked to Ms. Jennifer about immunity for you?

A. Yes, sir.

Q. And in return, what did she say would happen with the immunity?

A. She didn't tell me nothing. She—like she—

Q. She just said she had a conversation with Jennifer about immunity?

A. Yes, sir.

Q. And in return, that encouraged you to testify?

A. Yes, sir.

Q. And isn't it true, Jarius, that you expect your charges to be dropped, don't you?

A. Yes, sir.

Q. And you got that expectation from your lawyer, correct?

A. Yes, sir.

Q. And your lawyer got that expectation from the DA's Office, correct?

A. Yes, sir.

During redirect examination, the witness stated that no one from the District Attorney's office made any promises to him regarding immunity in exchange for his testimony. He agreed he was at trial pursuant to a subpoena. He stated that shortly before trial, he and his attorney met with Ms. Bellon. He further stated:

Q. Did she—at any time, did Ms. Bellon say anything about giving you any immunity or any promises?

10

A. No, sir.

Q. Okay. Okay. That's just what you're hoping for in connection with this case?

A. Yes, sir.

It is well-settled jurisprudence in Louisiana that a witness's hope that he might receive leniency from the state may be highly relevant to establish bias or interest, even though he has made no agreements with the state regarding the conduct. *State v. Sparks*, 88-17 (La. 5/11/11), 68 So.3d 435, *cert. denied,* ___U.S. ___, 132 S.Ct. 1794 (2012). In *Sparks*, the defendant alleged the state had withheld information regarding the benefits its witness received for her testimony. It was learned during the murder trial that the witness testifying against the defendant had several theft charges pending and had violated her parole, yet her parole was not revoked. It was later learned that she had received a Crime Stoppers reward of three hundred dollars for her testimony against defendant. The supreme court noted:

> The *Brady* rule encompasses evidence which impeaches witness testimony when the reliability or credibility of that witness may determine guilt or innocence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *State v. Knapper*, 579 So.2d 956, 959 (La.1991). *Brady* also requires the disclosure of evidence concerning a promise of leniency or immunity to a material witness in exchange for his testimony at trial. *Giglio v. United States*, 405 U.S. 150, 154-155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).
>
> Moreover, to the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope of knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." *State v. Brady*, 381 So.2d 819, 822 (La.1980) (collecting cases); *State v. Vale*, 95-577, p. 4 (La.1/26/96), 666 So.2d 1070, 1072. A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the State regarding his conduct. *Vale*, 666 So.2d at 1072; *State v. Nash*, 475 So.2d 752, 755-756 (La.1985); *see also State v. Bailey*, 367 So.2d 368, 371 (La.1979) (When circumstances indicated the witness might have received the impression that testimony favorable to the State would result in dropping of charges

11

against him, defendant was entitled to new trial where information was not revealed.)

*Id.* at 485-86.

In brief, the State argues Watson's attorney's request for immunity from the State's investigator, Jennifer Bellon, was not the same as a promise of immunity as she did not have the authority to agree to immunity in this case. After the defense rested, Assistant District Attorney, Cynthia Killingsworth, advised the trial court she never offered immunity to Watson in exchange for his testimony. However, it was not clear from Watson's testimony whether the investigator ever actually indicated to him directly that there might be a possibility of immunity. In *Sparks*, at the hearing for a new trial, the assistant district attorney testified he was not aware of the witness's theft charges. He further testified she was not arrested because of the structure of the "bad check program" in their office. The supreme court noted:

> [B]ecause the District Attorney's office is charged with knowledge available to all acting on the State's behalf in the case, *Strickler* [*v. Greene*], 527 U.S. [263] at 281, 119 S.Ct. [1936] at 1948 [(1999)], he has the duty to timely disclose "favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case." *State v. Kemp*, 2000-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. Here, whether or not the prosecutors knew about the pending charges and attachment, this still constituted impeachment evidence regarding Ms. Broadway's credibility and motivation to cooperate with the State. Thus, defendant has satisfied the first *Strickler* factor requiring the evidence have impeachment value.

*Id.* at 487.

The *Strickler* factors referred to in *Sparks* when determining whether a *Brady* violation undermines confidence in the outcome of the trial are: "1) favorable (impeaching or exculpatory) evidence; 2) that must have been withheld; and 3) prejudice must have been caused thereby." *Id.* at 486. In the current case, while there may have been nondisclosure of impeachment evidence, as in *Sparks*, the nondisclosure did not rise to the level of materiality necessary to establish

prejudice sufficient to undermine confidence in the outcome of the trial. As noted in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1985), evidence is material under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different had the alleged impeachment evidence been disclosed. In the current case, Watson's testimony was effectively corroborated by the testimony of Andre Broussard, who was also in the car with Defendant the night of the shooting. Broussard testified that Defendant shot out the window of the vehicle into a crowd of men they had confronted at the mall. He described the gun Defendant had in the center console of the front seat. Broussard further testified they went to Lambert's house afterwards and that Defendant burned his shirt, then after dropping Watson and Kelly off, Defendant, his brother, and Lambert went to Defendant's home. At the time of trial, Broussard's felony charge of inciting a riot was still pending and he testified that even though he hoped for leniency from the State, he had not been offered anything in exchange for his testimony.

We find, even if Watson received the impression he might gain leniency or immunity for his testimony, Defendant failed to show that disclosure of this information would have altered the outcome of the trial. Three separate witnesses (Lambert, Broussard, and Watson) all testified that Defendant fired the gun out the driver's side window.

*Terri Brown*

Defendant argues the State withheld a statement made by a witness, Terri Brown, averring she saw Defendant's vehicle at the mall prior to the shooting. Detective Kevin Kirkum, a sergeant with the Lake Charles Police Department, testified Brown had originally pointed out to the police where she saw Defendant's vehicle parked at the mall. However, a surveillance video utilized by the mall showed the vehicle in a different location than where Brown maintained she saw

13

the vehicle. Defendant argues "Detective Kirkum explicitly states at trial that he knew Terri Brown's statement was exculpatory vis-à-vis the state's theory and yet the information was never turned over to the defense prior to trial. The defense was prejudiced by not being able to properly investigate the inconsistency."

We note Defendant does not explain how this inconsistency is exculpatory. Furthermore, the inconsistency was disclosed to Defendant in the State's "Response to Defendant's Motion for Discovery and Inspection" filed on August 16, 2010. In paragraph 6 of the response, the State reported "[W]hen T.B., age 16, showed detective where she remembered the car being parked, it was different from the area of the parking lot where Det. Thomas saw the defendants enter their vehicle and wrote down the license plate number." As noted above, evidence is material and reversal warranted only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. *State v. Marshall,* 81-3115, 94-461 (La. 9/5/95), 660 So.2d 819. Defendant failed to show how this inconsistency would have changed the outcome of the trial. Three eyewitnesses, who were in the car with Defendant, testified he fired into the crowd of men. As a result, an innocent bystander, a fourteen-year-old girl, was shot in the head and killed. It is simply not reasonable to find the fact that a witness described the car parked in a different location than what was seen on the mall's surveillance video—a fact that the jury did hear—would have changed the outcome of the trial.

Defendants's first three assignments of error are meritless.

### *Assignment of Error Number Four*

Defendant argues defense counsel's performance in this case was ineffective. He contends defense counsel failed to adequately investigate the case and saw Defendant only one time prior to trial. He further alleges defense counsel should have filed a motion to sever.

14

A claim for ineffective assistance of counsel is properly raised in an application for post-conviction relief because this allows the trial court to order a full evidentiary hearing on the matter. *State v. Burkhalter*, 428 So.2d 449 (La.1983). However, where the record contains sufficient evidence to decide the issue, and the issue is raised by an assignment of error on appeal, it may be considered by the appellate court. *State v. Tapp*, 08-1262 (La.App. 3 Cir. 4/1/09), 8 So.3d 804; *See also State v. James*, 95-962 (La.App. 3 Cir. 2/14/96), 670 So.2d 461.

*State v. Christien*, 09-890, p. 7 (La.App. 3 Cir. 2/3/10), 29 So.3d 696, 701.

Defendant states he intends to file an application for post-conviction relief in accordance with the "*exhaustion doctrine*" for the reason that the argument is premature and undeveloped and requires an evidentiary hearing. Therefore, this claim is relegated to the post-conviction relief process.

## DECREE

For the foregoing reasons, Defendant's convictions and sentences for first degree murder and obstruction of justice are affirmed. However, the misdemeanor conviction of inciting to riot is severed from this appeal and Defendant is instructed to file an application seeking supervisory review of the misdemeanor within thirty days of the court's ruling on appeal if he so desires. Further, Defendant's claim of ineffective assistance of counsel is relegated to the post-conviction relief process.

**AFFIRMED IN PART AND SEVERED IN PART WITH INSTRUCTIONS.**